UNITED STATES BANKRUPTCY COURT  
EASTERN DISTRICT OF NEW YORK  
------------------------------------------------------------x  
In re:

NEW YORK SPOT, INC.,

                      Debtor.  
------------------------------------------------------------x

Hearing Date and Time:  
January 23, 2013 @ 2:30 p.m.

Chapter 11

Case No. 12-48530 (CEC)

## DEBTOR'S OPPOSITION TO MOTION OF WEST 22ND LLC TO LIFT STAY AND RETAIN STATE COURT RECEIVER IN PLACE

New York Spot, Inc. (the "Debtor"), as and for its Opposition to the motion of its first mortgagee, West 22nd LLC ("West 22") to vacate the automatic stay and excuse the state court receiver (the "Receiver") from compliance with the provisions of Section 543, respectfully states and alleges as follows:

### PRELIMINARY STATEMENT

1. While this case presents a second filing by the Debtor, circumstances have changed since the initial case, such that the Debtor has substantial prospects for a credible Chapter 11 plan of reorganization that will enable it to retain possession of real property located at 442 West 22nd Street, New York, New York (the "Property") improved by a four story building with 23 Class B (SRO) apartments.

2. Recently, the Debtor was contacted by a potential investor, Aron Tessler, who wishes to fund a plan of reorganization. Mr. Tessler is known to this Court, as he provided $5 million in financing for the successful confirmation of an affiliate of the Debtor, Martense New York, Inc.

3. This provides the Debtor with several options that were not previously available, including (i) a negotiated plan that could, for example, pay the mortgage holder all principal plus non-default interest at 6.5%, without the default rate interest of 24% and certain other unreasonable charges; (ii) a potential cram down plan that would lien strip the first and second mortgages, and pay West 22 the actual value of its collateral, or even (iii) a sale of the Debtor's Property through a confirmed plan pursuant to Section 363(b) and (f).

4. The Debtor is mindful of the rights of West 22 to an expeditious resolution of this case. However, those rights must be put into their proper context. Most importantly, the instant motion is largely predicated on an appraisal that significantly understates the potential future value of the Property. Although the appraisal acknowledges that the best use of the Property is to renovate the building from an SRO apartment building to a one or two family townhouse, the appraisal focuses entirely on the value of the Property based on its current status as an SRO.

5. Moreover, West 22 cynically argues that the Property is not generating sufficient funds to cover operating expenses, or to permit the Debtor to make adequate protection payments, while at the same time admitting that it has been working with the state court appointed Receiver to empty the building out by not replacing tenants, in order to get ready for a post-foreclosure changeover to the far more valuable townhouse use.

6. Given the new availability of funding, the rights of West 22, a speculator who purchased the mortgage after the foreclosure action was already pending,

need to be balanced against the prospects for maximizing the recovery for all creditors and the Debtor's current equity holder. Thus, the Debtor respectfully submits that it should be afforded the opportunity to negotiate and file a plan within the time frame established in Section 362(d)(3) of the Bankruptcy Code.

7. Accordingly, the Debtor has elected to re-file for Chapter 11 relief to prevent the foreclosure sale, in the hope of commencing a meaningful dialogue with the lender, with the aid of a new investor.

## BACKGROUND

8. The Debtor originally borrowed $1,920,000 from Intervest National Bank ("Intervest") on March 7, 2007. Thereafter, the Debtor defaulted in the payment of installments of interest and principal due May 1, 2010. On July 11, 2010, Intervest Bank commenced a foreclosure action against the Debtor in the Supreme Court of the State of New York, New York County under Index number 650877/2010 (the "Foreclosure Action"). Shortly thereafter, Gregory Soumas was appointed Receiver in the Foreclosure Action, and he has been collecting rents and managing the Property ever since.

9. The Debtor filed a Chapter 11 petition on May 4, 2011. The Debtor stipulated to a deadline by which it would identify a buyer or a third party investor. When the Debtor was unable to meet the deadline, it consented to the dismissal of its case, with a six month bar against a second filing. That period ended April 19, 2012.

10. By assignment dated February 11, 2011, Intervest assigned its mortgage to a third-party investor, West 22. West 22 has continued the Foreclosure Action and obtained a judgment of foreclosure.

11. Recently, the Debtor was approached by Mr. Tessler, who is willing to fund a plan in return for an equity interest in the reorganized Debtor. To protect the Property while the financing is being finalized, the Debtor filed a second petition on December 18, 2012.

12. In its motion, West 22 has calculated its secured claim at $3,002,492 as of the Chapter 11 filing. The Debtor estimates that only about $1,850,000 of this is principal.

13. The Property is also subject to a second priority mortgage lien in the principal amount of $635,000 held by NCC Capital LLC.

14. In addition, there are outstanding real estate taxes of approximately $100,000, according to the exhibits to West 22's motion.

15. Finally, the Debtor also has unsecured debt of at least $100,000 owed to five other creditors.

### **THERE IS NO BASIS FOR THE STAY TO BE VACATED**

16. West 22 moves to vacate the stay based on both Section 362(d)(1) and Section 362(d)(2).

17. With regard to the relief sought under Section 362(d)(1), the motion is predicated on the perceived lack of adequate protection. The Debtor respectfully submits that this part of the motion is premature.

18. First, the case is relative new, and Section 362(d)(3) provides the Debtor with 90 days to commence making payments or file a plan.

19. More importantly, the Receiver has been in place for more than two years, and has effectively run the Property into the ground. As West 22 admits in paragraph "2" of its motion, the Receiver has not replaced tenants as they have left, in an effort to empty the building.

20. Admittedly, this will increase the value of the Property in the long run, because the Property cannot be converted to a luxury townhouse while the current tenants are living there, but it is possible to arrange for short term tenancies to fill vacancies and generate cash flow in the interim.

21. Once the Debtor regains possession, he will be able to use the rents, including short term leases for the currently vacant apartments, to make adequate protection payments and keep current on real estate taxes. Although West 22 suggests in its motion that there are insufficient monies generated to operate Property even at full capacity, the Debtor's current owner, Yehuda Nelkenbaum, is willing to fund any shortfall once the Debtor recovers possession of the Property.

22. In any event, it is cynical indeed for West 22 to be purposely deflating the income generating ability of the Property and then using that lower income as a basis for why the stay should be vacated.

23. Similarly, while the July 12, 2011 appraisal obtained by West 22 during the earlier Chapter 11 case suggests that the Property lacks equity, there are substantial problems with the appraisal, largely based on the fact that it completely ignores a potential future increase in value.

24. By ignoring the highest and best use, the Appraisal is able to downplay the most important comparable sale, identified on page 54 of the Appraisal as "Comparable Sale #1," where an SRO of the same size, built at the same time, circa 1900, and located less than one block from the Debtor (338 West 22nd Street, as opposed to the Debtor's address of 442 West 22nd Street), was sold on December 15, 2010 for $3,600,000.

25. The sole difference between the two properties is that Comparable Sale #1 was delivered vacant and ready for conversion, while the Debtor needs to complete a changeover to vacancy before it can be converted.

26. But even as the parties dispute value, there can be no disputing that the Property is essential to an effective reorganization, and Section 362(d)(2) permits the stay to be modified with respect to specific property only if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

27. There are several paths available for a Chapter 11 plan, now that funding has been identified. Most obviously, the Debtor can use Section 506 to cram down the first mortgage held by West 22. Alternatively, West 22 may be willing to negotiate a consensual plan, rather than continue to litigate issues of valuation and cram down. Another possibility is a formal Section 363 sale to Mr. Tessler through a confirmed plan.

28. In reviewing the likelihood of a confirmable Chapter 11 plan for the purposes of Section 362(d)(2), the Debtor is entitled to the latitude of pursuing a

reasonable possibility of a successful reorganization within a reasonable time. United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S.365, 375-76, 180 S.Ct. 626 (1987). Moreover, the Supreme Court duly noted that when a motion for stay relief is made in the early stages of a bankruptcy case, prior to the termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects. Id. at 376.

29. At this extremely early stage in the case, which is barely one month old, the Debtor respectfully submits that it should be given the benefit of the doubt, and afforded at least until the Section 362(d)(3) deadline to complete its financing arrangements and negotiate with its creditors.

30. Moreover, despite the scorn with which West 22 approaches this second petition, this is not a bad faith filing, but rather, a legitimate effort by the Debtor to retain a valuable real estate holding against an opportunist who purchased the mortgage at a steep discount in the hope of reaping the future value of the Property by focusing on the Property's current status and not its potential.

31. Now that circumstances existing at the time of the initial Chapter 11 filing have changed, and investors have been identified, the Debtor is using Chapter 11 protections to provide an opportunity to reorganize rather than lose its Property through foreclosure.

32. The test for good faith/bad faith was developed by the Second Circuit in In re Cohoes Industrial Terminal Inc., 931 F.2d 222 (2d Cir. 1991) and In re C-TC 9th Avenue Partnership, 113 F.3d 1304 (2d Cir. 1997). The prevailing test – which

combines an analysis of objective futility involving persons or entities facing financial difficulty and subjective bad faith – turns upon whether the debtor intends to reorganize and whether a reasonable possibility exists that the debtor will emerge from bankruptcy. *See*, In re 68 West 127th Street LLC, 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) [Synthesizing Cohoes Indust. Terminal, *supra*, (Bad faith exists, if it is clear on the filing date, there is no reasonable likelihood that the debtor intended to reorganize and the debtor has no probability to emerge from bankruptcy) and C-TC 9th Avenue, *supra*, (Chapter 11 petition may be "frivolous" if the "debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing")]. *See* In re RCM Global Long Term Corp. Appreciation Fund, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ["… a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing." (emphasis added)]. *Accord*: In re Carolin, 886 F.2d 693 (4th Cir. 1989); In re Sylmar Plaza, L.P., 314 F.3d 1070 (9th Cir. 2002).

        33.    Under any reasonable interpretation, the Debtor passes this test of good faith, and seeks only to exercise certain rights under the Code that are perfectly legitimate, although they may appear hurtful, even malicious from the point of view of West 22. As stated by Judge Fox in In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987):

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts

8

> must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other [Code] enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

34. In this regard, the decision by the Hon. Robert Drain in <u>In re 68 West 127 Street, LLC</u>, *supra,* is also instructive. In that case, Judge Drain acknowledged that many of the C-TC 9th Avenue factors were present, but then explained that "courts repeatedly caution, however, not to apply such factors mechanically . . . Lists of such factors, then ultimately do no more than assist the exercise of discretion." <u>In re 68 West 127 Street, LLC</u>, 285 B.R. at 844.

35. Nor is the fact that this case was commenced on the eve of a foreclosure sale ground for lifting the stay. As Judge Drain noted:

> notwithstanding the routinely cited bad faith factor of an eve-of-foreclosure bankruptcy filing, apparently no court has applied that factor in isolation to find bad faith. Indeed, several courts have observed that resort to bankruptcy to stave off foreclosure is consistent with bankruptcy's goals of preserving going concerns and maximizing value.

<u>Id.</u>, at 845.

36. Very often, creditors are frustrated by bankruptcy, but this, too, is not an indicia of bad faith. Indeed, as the Second Circuit Court of Appeals explained in <u>Cohoes,</u>

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself establish an absence of intent to seek rehabilitation. Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense be "frustrated" when their debtor files a bankruptcy petition. In reality, there is a considerable gap between delaying creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.

In re Cohoes Industrial Terminal Inc., 931 F.2d at 238. (citations omitted).

37. The Debtor intends to move quickly to fix a bar date for claims and draft a plan which will hopefully form the basis for negotiations with West 22. As the Debtor has substantial and legitimate prospects for a successful reorganization, there is simply no basis for vacating the automatic stay at this juncture.

### **THE RECEIVER SHOULD NOT BE CONTINUED**

38. Section 543 provides as a general rule that upon the filing of a Chapter 11 petition, a custodian, such as the Receiver, must turnover property of the estate to the debtor and to account for all property and proceeds received and disbursed by the custodian.

39. West 22 seeks to excuse the Receiver from compliance with these statutory obligations, effectively keeping the Debtor out of possession.

40. The Bankruptcy Code strongly favors the termination of the Receiver in favor of the Debtor having complete control of its property. As one Court has explained:

> The turnover provisions of 11 U.S.C. § 543 are part of the statutory expression of the Congressional preference that a Chapter 11 debtor be permitted to operate and control its

>business during the reorganization process. Moreover, that operation is for the benefit of all constituencies and is not solely for the benefit of the lender holding the primary mortgage against the debtor's property. "[G]enerally the basic equities would favor a debtor or debtor in possession. If nothing more, a substantial weight is added to the debtor's burden of attempting to reorganize and promulgate an acceptable plan of reorganization if the debtor cannot have access to all of its assets during its initial breathing spell." [citation omitted].

In re Northgate Terrace Apartments, Ltd., 117 B.R. at 332-333.

41.  In making a determination of whether to terminate the receiver, the Court should consider a number of factors, including:

(a)  whether there will be sufficient income to fund a successful reorganization;
(b)  whether the debtor will use the property for the benefit of its creditors;
(c)  whether there has been mismanagement by the debtor; and
(d)  whether there are preferences which a receiver is not empowered to avoid.

See, e.g., In re Constable Plaza Assocs., L.P., 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991).

42.  In this instance, the Debtor has realistic prospects for reorganization based upon the injection of third party monies to fund a plan. Those prospects will be greatly improved once it is able to begin collecting rents and maintaining the Property. Moreover, the Receiver is not managing the Property with a view to maximizing current income. The Debtor needs to remove the Receiver so that it can re-let the vacant apartments on an interim basis and generate operating funds from which to make adequate protection payments to West 22.

43. Finally, as the Hon. Howard Schwartzberg explained in <u>Constable Plaza</u>, *supra*, there are also practical considerations to address:

> A more significant factor to be considered is that the state court foreclosure action has been halted by the automatic stay imposed under 11 U.S.C. § 362. Therefore, if the basic action in which the state court receiver was appointed is no longer active, there is no reason to excuse the receiver's compliance with 11 U.S.C. § 543(b)(1) in order to activate a state court receiver whose appointment was ancillary to the enjoined foreclosure action. Unless and until the automatic stay is modified or terminated, the administration of the debtor's case and the disposition of property of the estate should continue under the aegis of this court and in accordance with the general provisions of the Bankruptcy Code and Rules.

<u>In re Constable Plaza Associates, L.P.</u>, 125 B.R. at 104.

44. In short, West 22 has not met its stringent evidentiary burden for overriding the strong preference that a debtor-in-possession retains control of its Property.

WHEREFORE, the Debtor prays for the entry of an order denying 3C's motion in its entirety, and granting such other and further relief as is just and proper.

Dated: New York, New York
January 18, 2013

>                                    GOLDBERG WEPRIN
>                                    FINKEL GOLDSTEIN LLP
>                                    *Attorneys for the Debtor*
>                                    1501 Broadway, 22nd Floor
>                                    New York, New York 10036
>                                    (212) 221-5700
>
>                              By: _____
>                                    J. Ted Donovan, Esq.

X:\GWFG\New Data\Yen\Word\New York Spot Inc.(Bankruptcy) (# NELYE.30180)\2nd Petition\Opposition To Lift Stay Motion 01-18-13 (V2).Doc

12